### John D. Burgess *v.* George W. Chapin.

There is no implied warranty of the past or future solvency of the maker of a note, from a mere exchange of it, without indorsement, for merchandise; the rule of *caveat emptor* applying, in the absence of fraud, to that, as well as to the quality of the merchandise. Knowledge of the insolvency of the maker of the note, at the time of the exchange, on the part of him who thus exchanges it, or of such facts that he must reasonably infer from them the insolvency of the maker, would make the transaction fraudulent on his part, and enable the other party, if concealed from him, to rescind the bargain; but knowledge merely of the fact, that the maker, who was a small manufacturer, had renewed one of his notes, alleging as an excuse that he had been short of water and thus unable to realize from the products of his mill, is not a fact from which the exchanger of another of his notes is bound to infer his insolvency; nor is it a fact which the other party can claim should have put the exchanger of the note upon inquiry as to the solvency of the maker of it; since such exchanger is bound to no diligence in acquiring knowledge of the value or quality of the subjects of the exchange, in order to communicate it to the other party, but only to good faith, regarding the knowledge which he actually has at the time of the exchange.

Assumpsit to recover $1,626.32, the price of thirty-one bales of cotton, being 14,042 lbs., at 11½ cents per lb., together with the sum of $53.64, delivered and paid by the plaintiff to the defendant on the 26th day of September, 1855, in exchange

for the note of Randall Holden, 2d, dated July 25, 1855, for $1,666.25, and payable six months after date, to his own order, and by him indorsed.

At the trial of the case before the court, a jury trial having been waived by agreement, it was proved, that on the 26th day of September, 1855, the defendant, through a broker, according to a very common course of dealing in the cotton trade of Providence, exchanged with the plaintiff a note of Randall Holden, 2d, a cotton manufacturer, at six months, for $1,666.25, dated July 25, 1855, for thirty-one bales of cotton, which he took at 11½ cents per lb., being about one half cent per lb. above the market price, and received the difference, $53.64, in cash, from the plaintiff. The note was made payable by Holden to his own order, and by him indorsed, and, without indorsement by the defendant, was received by the plaintiff from the broker, who at the same time received the cotton for the defendant. It turned out, that at the time of this transaction, Holden was insolvent; and that, commencing some ten days prior to it, he had been round to some of his creditors, as his notes became due, and upon exhibiting a statement of his affairs, obtained a renewal of his notes, without security; until some ten days after the transaction, one of his creditors refusing to renew, he openly failed. It was attempted to be proved, that the defendant had admitted, that previous to his exchanging the note of Holden for the cotton of the plaintiff, he had heard that Holden had made a statement of his affairs, and was renewing his notes generally; but it *was* proved, that he had heard from a cotton broker that Holden had renewed one of his notes, giving as an excuse that he was short of water, so that he could not finish his products for market; and the plaintiff himself swore, that this was all that he had heard or knew at the time of the bargain; that it was not mentioned to him at the time as a matter of any consequence, and did not affect in his view, at the time, the credit of Holden; and that when he parted with his note for the plaintiff's cotton he believed that the note would be paid at maturity. The broker who communicated to the defendant the fact of Holden's renewing one of his notes, confirmed the defendant's testimony as to the limited nature of the commu-

nication made to him; and the broker who conducted for him this, and another transaction of a similar character in Holden's paper made about the same time, swore, that this was all the admission he made to another witness, who testified to the more ample admission attempted to be proved upon him; the broker having been present at the interview between the defendant and that witness.

*T. A. Jenckes*, for the plaintiff, contended, that the transaction was fraudulent on the part of the defendant, who at the time knew, that Holden had made a statement of his affairs and was renewing his notes for the perfectly well-understood reason " that *his water* was short;" and, at all events, knew, that he had renewed one of his notes, and was thus put upon inquiry as to his actual condition, with which, inquiry would have acquainted him. He insisted, that under such circumstances the defendant was bound to inquire as to the fact of solvency, before he could honestly bargain away, as good, the paper of Holden, and to communicate to the bargainee what he had heard; likening the case to the case of one procuring insurance, and bound to communicate to the insurer every fact which would materially increase the risk.

*Payne* and *R. W. Greene*, for the defendant, argued, that this was a barter, in the open market, of a note of second-rate credit, for cotton, on that account put above the market price—a transaction in which each party proverbially was to take care of himself; and that the mere fact that the defendant had heard that Holden had renewed one of his notes, alleging as an excuse for it a very common cause for such indulgence to a small manufacturer, was not sufficient to fix him with such knowledge of Holden's real condition as would taint the bargain, sought by this action to be rescinded, with fraud.

AMES, C. J. This is another of the cases which have grown out of the barter of cotton for the notes of third persons, common in the market of Providence, in which cases, as we have before considered, there is no implied warranty of the past or future solvency of the parties to the notes; the rule of *caveat emptor* applying, in the absence of fraud, to that, as well as to the quality of the cotton. Knowledge of the insolvency of the

maker of the note, by the defendant, at the time he exchanged it for the cotton of the plaintiff, or of such facts as that he must reasonably infer from them the maker's insolvency, would, without doubt, make the transaction fraudulent on his part, and as such, if concealed from him, enable the plaintiff to rescind it. Knowledge of the fact that the maker of the note had asked and obtained from one of his creditors a renewal of one of his notes, without security, alleging, as an excuse, a fair one for a small manufacturer, that he had been short of water, which is all the knowledge we deem proved upon the defendant, is, in our judgment, far from being knowledge of the insolvency of the maker, or of a fact from which the defendant would be bound reasonably to infer it. The very indulgence of the creditor, granted without additional security, would tend to lull all suspicion; and when we have the oath of the defendant, that the knowledge of this fact did not in the least impair the credit of the maker in his view, and that at the time he parted with the note he believed that it would be paid at maturity, we should be guilty of substituting a vague, conjectural, suspicion, for the *proof* of fraud which the law requires, if we should come to the conclusion that this bargain of exchange was tainted by it. There is no such analogy, as the counsel for the plaintiff seems to suppose, between the case of one who proposes for insurance either for himself or another, and the case at bar, in which the parties meet in open market upon the well-known common-law ground of *caveat emptor*. In the former case, disclosure of every fact material to the risk is imposed by law as a duty upon the assured, from his presumed knowledge, and the insurer's presumed ignorance, of all that relates to the subject of the insurance. Both act upon this well-known rule of presumption and policy of the law. In the latter case, on the other hand, it is quite as well understood, that where there is no warranty, each party to a common-law contract of sale or exchange is to look out for himself. Neither is bound to express to the other his opinion of the true merits of the bargain in which they are about to engage, or to disclose to each other the slight and inconclusive facts calculated to sway opinion with regard to the subjects of it. In the case at bar, the parties were confess-

edly dealing in paper which did not enjoy a first-rate credit; and the plaintiff covered the risk which he confessedly took, by exacting and receiving a half cent more per pound for his cotton than the market price. The fact known to the plaintiff about Holden's renewal of one of his notes, was not communicated to him as a secret; and he had a right to suppose, that it was as well known to the plaintiff, as to himself. It certainly might have been known, and much more, it seems, to both, had they made inquiry.

And this brings us to another suggestion made by the counsel for the plaintiff, that the fact known to the defendant was one that at least put him upon inquiry, which, if he had made with ordinary diligence, would have led him to other facts, conclusive as to the insolvency of the maker of the note bartered to the plaintiff. But the law does not require of him who, without warranty, sells or exchanges a chattel, diligence, either greater or less, in ascertaining the defects of what he is parting with; since there is no obligation on him to disclose such defects unless he *knows* them, and knows that they are concealed from the other party by art, so that he cannot by ordinary diligence discover them. As there is no obligation to disclose these, unless known, there can, of course, be no obligation to acquire knowledge in order to be able to disclose fully concerning them. The relation between buyers and sellers and between exchangers, dealing without warranty, imposes no duty of knowledge on either, as to the subjects of their contracts; but only the duty of honesty, which is quite compatible with total ignorance with regard to the quality and value of those subjects. On the contrary, under such circumstances, each is bound to inquire, and obtain the knowledge requisite to enable him skilfully to contract, for himself; and if he will not, or does not, the very last person, in the eye of the law, of whom he has a right to complain, for not informing *himself* that he might inform *him*, is the party who, in the competition of trade, is dealing thus antagonistically with him. The case of *Raphael* v. *The Bank of England*, 33 Eng. L. & Eq. R. 276, is to the point, that in carrying on the business of buying and selling paper,

the sole duty to others is, *bona fides ;* not diligence in caring for their interests. In that case, the plaintiff, who was a Parisian money-changer, had bought in Paris, for value, a stolen Bank of England bill, for £500; and, under the direction of the court recovered the amount of it against the bank, notwithstanding it was in proof, that a notice of the theft was left at his place of business previous to his changing the bill, and that it was the custom of his office to file such notices, and to examine the file whenever a bill or note of very large amount was offered; the jury having found that he took the note *bonâ fide.* The court of common pleas refused to disturb the verdict; upon the ground, that the settled doctrine of Westminster Hall was, that a want of care, or negligence, in receiving a negotiable instrument, could not invalidate a party's title to it, if he had acquired the title in good faith. This was but the application to the case before them of the principle, common to all transactions of mere buying and selling, that it is good faith in doing one's own business, and not diligence in caring for the interests of others, which, in such an act, is required by the practical morality of the law. As we see no reason to doubt the defendant's good faith in the transaction before us, judgment must be entered for him.